Welcome to the first day of arguments of this panel of the Fifth Circuit. We have three cases today. We are likely to take a break after the second case and then return, we promise, for the third. I note that there are some students from Mississippi State University in the audience today, pre-law. So do your best, advocates, to keep them on track to decide to become lawyers, at least some of them. We do have a lighting system you're probably each familiar with. When the red light comes on, that means, unsurprisingly, stop. And if we are going to give you more time, we will do so. But don't take it without it being given to you. I'll call the first case of the day, United States v. Tolentino. We'll hear from the appellant. Good morning, Your Honors. May it please the Court. My name is Adam Nicholson. I'm from the Federal Public Defender's Office in Fort Worth, Texas, and I represent Julisa Tolentino. She is the defendant and appellant in this case. Your Honors, this case involves an illegal restitution order. There are three reasons why this Court should vacate that order and remand for resentencing in this case. How about, I call to your word, illegal. Discuss with us, because there seem to be about two or three different issues that all seem to be the same thing, but they're running back and forth. I've got concerns about the standard of review here. You urge de novo, of course. The government urges plain error, of course. And you didn't file a reply brief, unless you filed one and I just didn't get one. Did you file a reply brief? That's correct. We did not, Your Honor. Why not? Honestly, Your Honor, I am the person making the oral argument in this case. It was filed by one of my colleagues. Well, you know that doesn't count for anything. So why wasn't a reply brief filed? In this case, Your Honor, I do not know. So we don't have your position on the government's position that it's plain error standard of review, which seems to be the better argument. So tell us why this is de novo and not plain error. Yes, Your Honor. To that point, Your Honor, in the pleadings below, the — Well, that's where we get in trouble, the pleadings below. That really is meaningless, the word pleadings. It's a very misused and narrow term. And I know that at sentencing the objection was made, we object for the reasons stated in our pleadings. That's just mush. That doesn't tell the district judge anything. So tell us why plain error should not apply. Okay. Well, to that point, Your Honor, the court was put on notice from the very beginning of the responses to the PSR and the government's objection to the PSR that we disagreed with the restitution request to be put at the figure that was determined to be the tax loss, also called the intended tax loss within that. So the court was placed on notice from those pleadings that we disagreed. But was it this exact same argument? Because it doesn't seem like the same argument. It just seems like y'all were saying we should pay the — I think it was $37,000 that the PSR said your person expressly agreed to or admitted to and nothing else. But it didn't — this intended versus actual and all the detail that we're getting now, was that told to the district court? If so, tell me the record site so I can look at it again. At that level, Your Honor, as to the intended versus actual loss, I actually concur with you, Your Honor, that at that level we did not raise it at the position below. There are two — Isn't that the key level? I mean, you can't just say I object to restitution and that then covers everything from A to Z and alpha to omega about restitution. That's a little much to expect the district court to read your mind. So what would have put the district court on notice of the argument you're now making to us? To that argument, I agree, Your Honor. Okay. That argument as to the amount of actual loss versus intended loss, I would agree, would be at the point of plain error. And I believe — And what about this — we'll just call it confusion, if you will, the confusion you're alleging about the plea agreement and what it means and what it encompasses? Where was the district court put on notice of that argument? At that level, Your Honor, the government raised objection to calculating the amount of restitution at the actual loss figure that was found in paragraph 20 of the PSR that was originally then translated in paragraph 85. The government objected to that, and we then in our response spent much detail going into why that information was not correct according to the plea agreement. The plea agreement opened up restitution in this case beyond the statute of — beyond the offense of conviction by saying two things. In paragraph 3 of the plea agreement, it put the defendant on notice that restitution could be ordered according to relevant conduct. But then paragraph 5 was the affirmative agreement to pay restitution, which cabined the restitution amount at the actions that were as a result of the criminal conduct of Ms. Tolentino's work in filing and preparing tax returns. At that level, Your Honor, I do believe that because of the substantial arguments that were made back and forth between the government and ourselves, that that placed the court on notice as to our objections to the relevant conduct consideration for other employees and the co-owners' work being applied to — What page should I look at to get this language you think that the district court put on notice? I will — it would be in our — it would be in the defendant's response to the government's objection. I can get page numbers for the record on that for you when I come back for rebuttal, Your Honor. Okay. So to go back, let's assume that plein air review applies on the question of intended loss versus actual loss. Even if that is the standard, Your Honors, we do have evidence in the case that shows that there was plein air here. So if I can direct the court to page 116 of the record, that's where you'll find the PSR language that deals with the amounts of loss. There are two key paragraphs the court will find in the PSR that deal with this — the information that should address this very question. Paragraph 19 of the PSR is titled Tax Loss for the Guideline Calculations. In that paragraph, that is where the PSR comes up with the $2.3 million figure. And twice inside that paragraph, the PSR describes the tax loss not just as tax loss, but as the intended tax loss, ascribed to the entire operations that sent all of the filings from the Grand Prairie office. If the court will direct its attention then also to paragraph 20 on that same page. The next paragraph is labeled Victim Impact. That is where the $37,000 figure that was originally recommended for restitution to be paid came from. That paragraph describes the $37,000 figure as the actual loss that was ascribed to Ms. Tolentino's actions. The government objected to both paragraph 19, which was the tax loss calculation, but they only objected to the point that they recommended a reduction from $2,317,000 in some change to $2,312,000 in some change. They did not object to the language calling that the intended tax loss. They objected to paragraph 85, which is the restitution recommendation, stating that they believe that the right amount of restitution was the tax loss instead of the $37,000 that was recommended originally, which was in line with what the court found to be the actual loss. The court at sentencing adopted the factual findings of the PSR. Those factual findings would include the intended loss from paragraph 19 as well as the actual loss from paragraph 20. This is legal error. This Court has held that restitution exceeding the amount of actual loss is an illegal sentence. Under the plain-error standard, all the problems would be met. Let's go and look through it. So at the plain-error standard, does this restitution order violate? What about the Bolton case?  The Bolton case? Absolutely, Your Honor. So the Bolton case is cited in the one of the 28-day filings by the court or by the appellee. The Bolton case is easily distinguished from this case. First of all, it is a case that involves a fraudulent tax filing done by a married couple for themselves. They then complained that the intended tax loss was not an actual loss. And in that case, the court shifted the burden from the government to the defendants to prove that the tax loss was not the same, the intended loss was not the same as the actual loss. Excuse me for a moment. In that case, the government or the court shifted the burden. The Sharma cases, the government cites in its briefs, discuss that shifting the burden may be appropriate where justice dictates. And in that case, where the defendants were the same people who benefited from the tax loss and could easily prove that they had made restitution by making payments to the IRS already, shifting the burden onto the defendants in that case makes perfect sense. All right. But this is something the district court would have had to parse through, and I'm struggling to where that was put clearly before the district court. I'm sorry. The need to do the subtraction. I can't subtract a number I don't have. Okay. So where am I, if I'm the district judge here, where am I put on notice that I need to do a subtraction and something to help me find that number to subtract? Your Honor, going to that question, the burden of proof lay on the side of the government unless the district court placed that burden onto the defendants. Right. But the burden to object is on the party objecting. And I'm looking at the response to the government's objections, and it's all focused on it's not relevant conduct because she didn't know about it. She only knew about her own conduct. That's a different question from the subtraction question and from the plea agreement confusion question and all of the other stuff that your appeal focuses on. The it's not relevant conduct because I didn't know about it, to me, is a different argument than intended versus actual or paragraph 3 versus paragraph 5 of the plea agreement or you didn't subtract what you needed to subtract. And we have this come up in these Medicare fraud cases all the time. The doctor did actually provide some service, did actually provide some medications to the people while also lying about some piece of it. And that comes up at the district court. And if it doesn't, we review it for plain error. Right? Or is there a case I'm misremembering? I do believe you're right, Your Honor. But in this case, what we have is the court having found from the PSR an actual loss calculation that was ascribed to Ms. Tolentino that differed by more than $2 million from the amount of intended loss that was applied there. Right, but this isn't something like I sat in my house and said, you know, I think it would be really nice to rip off Mr. X to the tune of $2 million. Dum-de-dum-de-dum, and that's the intended loss, and whoa, all of a sudden I'm having to give restitution when nothing ever happened. Here, these tax returns were filed. No question about that. Okay? And so as a result, that $2 million isn't some made-up number. Now, your argument is maybe the IRS figured this out and came back and got the money from the people. But that's not the same thing as saying, well, the intended loss being equated to the actual loss is some crazy whirl. It makes sense here because these were actual tax returns that were filed and people got refunds that they shouldn't have gotten. And so yours is a theory that maybe the IRS went back and caught this when we know that they have millions of tax returns and their ability to go back isn't always what they would like it to be. But in this case, Your Honor, to that point, the IRS did capture a number of returns. They caught the events that were going on at first choice by looking at the number of returns that were coming back with large returns more so than what they would have expected it to be. That investigation began in the year 2012. Sentencing in this case was in the year of 2018. And in order for the intended loss figure from paragraph 19 to still apply in the year 2018, six years later, that would mean that the IRS and the hundreds of filers who received the benefit from the fraudulent filings would not have paid $1 of the amounts. But is it your position you did not have to make the subtraction argument, that the government had to disprove the subtraction sua sponte? Yes, Your Honor. That is really stretchy. You have no proof of any actual, of any repayment. You make that statement and you brief. It's just speculation. What's your best case for this don't have to make a subtraction argument in the district court? I would point to the cases that we have cited, especially even from the government's own. For example, the Bolton case, where that is a case where it dealt with the amount of restitution and the tax loss formula and it being applied first to the government and then switched and transitioned to the defendant. Other cases, such as the Sharma cases. Mr. Bolton says that the district court is granted wide latitude to simply make a reasonable estimate based on their available facts. Yes, Your Honor. But I would argue that in this case, the amount of $2.3 million, with hundreds of tax returns having been filed and caught six years before the date of the sentencing, it's not reasonable to believe the IRS did not capture a single penny from that amount. But you never requested the court require the government to do that at sentencing or prior to sentencing. That's correct. All right, counsel. You'll have some time for rebuttal to follow up on some of this. Thank you very much, Your Honor. Sure thing. Could you start there? Can you wrap up the government's position on what we have just been hearing? Why would the government, when the practical situation that opposing counsel just talked about, some opportunity for the government to recoup some of this? Why is there no obligation on the government's part to show that did not happen or to what level that happened? Yes, Your Honor. The restitution statutes govern the burdens of proof in this case. And if you look at 18 U.S.C. 3664 F1A, it states that that initial restitution calculation, the base amount, is supposed to encompass all of the loss actually incurred. Part B states that you don't take into account in that initial calculation any sums that may be due to the victim. If you go further down in the statute to J2, that part explains that any amounts recouped, which recoupment doesn't have any effect on whether that loss was actually incurred in the first place. That's just the IRS going back after the fact and trying to mitigate its damages. That is applied as an after judgment credit to the restitution amount. That has no impact on the initial loss calculation. But when would such a recoupment credit be applied? After the judgment is entered. And in a case like this where you have joint— Tomorrow? I mean, just how, practically speaking, does that work? As those amounts are recovered by the IRS, the IRS maintains— and this is not in the record, but I can answer your question, Your Honor. The IRS does maintain a database of these restitution figures and applies the amounts that it's able to recoup to those judgments. But his point is that for six years between when all this fraud was going on and when we finally got to the sentencing, was the IRS just sitting there? Because, I mean, they have a statute of limitations and so forth. I would envision that they would be doing their recoupment sometime in that six years. So why don't we already have that on the computer? Your Honor, the record doesn't reflect that because the defendant never raised it as an objection. In this case, if the matter had been brought to the district court's attention, they would have put on notice that there's a possibility of offsets that may be applied to that restitution amount. But because an objection was never made and that issue was never brought to the district court's attention, the court didn't have an opportunity to resolve that question. So now we're looking at it for the first time on appeal without any evidence. But let's say that somehow Ms. Tolentino won the lottery or something. She had the money. I'm assuming to some degree this is a little bit fictional in the sense that she's unlikely to have the money. But let's assume, argumentatively, she has the money and she was saying, okay, now I'm ready to write my check, my restitution check. What do I owe, Mr. IRS? Would they have already on the computer that, oh, well, John Doe gave us back $1,000 and Jane Doe gave us $2,000, so we've got to subtract all of that. Is that already there? Would she have to ask for that? Would they do that automatically? If she sent in a $2.3 million check and they had actually gotten $300,000 in recoupment, would they say, oops, and refund the $300,000? How does that work? Yes, Your Honor. The statute does prohibit double recovery, and it does provide that any amounts that have already been paid would then be sent back to the person that had paid those amounts. So, for example, if she won the lottery and she sent $2.3 million to the IRS, they maintain in their database that if recoupments had been received, if joint and several liability, maybe her co-defendant won the lottery and that amount had been satisfied. They maintain a running tabulation of those figures, and she's not going to pay and the IRS is not going to double recover those amounts. Well, they're not entitled to it. It does sound to me a bit loose as how this actually gets folded into the actual demand upon a defendant. And regardless of what we do at this case, it depends a lot on what standard review is and that sort of thing. It does seem to me that this should have been part of the government's presentation, that as of this date, here's where we stand, as opposed to something they have to object to and raise and hope that when they send the $2.3 million check in, the IRS will do the right thing as we always expect them to do. I know you're getting your best estimate of how this works, but it doesn't seem to work very well. Well, Your Honor, this Court has long held, starting with Sharma and all the way through Maroondah and in Bolton, that the burden of proof shifts. Once you have a reliable loss calculation, as we have in paragraph 19 of the PSR, the burden of proof shifts to the party who is incentivized to challenge that calculation. This Court's case law is abundantly clear that the burden for proving offsets lies with the defendant. We don't have any proof here whatsoever. The defendant doesn't even try to meet that burden. Does this come under that factual finding thing that we say, which I don't necessarily agree with but is our precedent, that when something is a factual finding that it can never be plain error? It does, Your Honor. Okay, because you're saying that they could have demanded discovery of, well, what recoupment did you get, and then put that on, and then the district court could have done a subtraction, or if there was actual disputes about what John Doe gave back and so on and so forth, the district court could have resolved that. That's your position. Exactly. Now, let me get back to this notion that the computer is keeping track of it and that Ms. Tolentino is ready to write a check. Could she now say, IRS, what do I owe? Because haven't you recouped something in the ensuing seven years? And so $2.3 million was the max I owe, but is there, you know, has John Doe paid some money back, so-and-so, so-and-so? I ran into Mr. X at the grocery store, and they said so much had been paid back, or, you know, whatever. Sure. And, again, this is not in the record, but I do want to explain the process. The U.S. Attorney's Office sends periodic updates to the defendants of, here's your restitution balance. That would take into account amounts that had been received from co-defendants, offsets, that sort of thing. Tolentino could also reach out to the IRS directly and get that number. She could reach out to our office, to the IRS. She could obtain the current number at any time. This is not an issue that bears on the initial loss calculation here. It can't show any clear or obvious error as to whether or not that loss was actually sustained by the IRS. These are all issues. Well, typically offset is an affirmative defense, so your argument is that's true under this statute. She needed to sort of plead and prove it. But all is not lost, so to speak, because even if today she wanted to write a check, she could ask her lawyer to contact you, and you would get that information from this elusive computer. Correct. In your brief, you talk about they never objected about this actual loss, and when you're talking about that, you're talking about how much has been the offset, et cetera, et cetera, et cetera. But do you agree that they did raise the point of we're only responsible for the actual, as it stood then, as opposed to intended loss? The only objection, and it's difficult to even call it objection, the record at page 164 is where you will find the only commentary to the restitution amount here, and it was a vague statement that this amount of restitution, the $37,000 amount, is consistent with the findings in the investigation and reflected in the PSR. That doesn't put the issue forward. You're saying they never said to the judge, Your Honor, you can hold defendant responsible only for actual as opposed to intended loss? No. They never said that? They claimed that the only arguments made to the district court were in the scope of relevant conduct. It's a long speech about relevant conduct, but it doesn't say intended versus actual. The only arguments were made, were arguments aimed at trying to differentiate her culpability in the offense from that of her co-conspirators. The district court was never on notice that intended loss doesn't equal actual loss. They were never on notice that there should have been offsets, and they were never on notice that the plea agreement somehow created a carve-out to the scope of relevant conduct that she could be ordered to pay restitution for. These are all factual questions raised for the very first time in this court, and the district court never had an opportunity to resolve them or to review the record to see if those objections had any merit. Assuming you agree that generally in restitution you're only responsible for the loss you caused, actual as opposed to intended, just assume that, how does the plea agreement get around that? In this case, the plea agreement has two provisions that expand the scope of conduct that she can be accountable for. The first states that the defendant agrees that she may be responsible for restitution from all relevant conduct. The second states that she agrees she will pay losses resulting from all of her conduct involving preparing and filing the tax returns in this case. Well, the second one sounds like actual loss. The first one is the best one, but then you say, well, this is ambiguous. You've got conflicting provisions. Well, the government would disagree that they're ambiguous or conflict. As we stated in our brief, the second is merely an agreement to pay losses for conduct resulting from her full participation in this conspiracy. It's not just the pleaded claim. Correct. Each and every tax return that's included in that loss calculation had her PTIN and EFIN number on it. So her number was on the filing of every single tax return that is included. The whole $2.3 million. Every single tax return. Well, let me ask you, are you saying then that paragraph 5 of the plea agreement, which is the only thing it seems to me that clearly says I agree, that that freestanding by itself is enough to make her responsible for the $2.3 million? That read in conjunction. That's what I'm trying to avoid. So you're saying you do need the maximum penalty section as well. Well, the government would argue, read together, it clearly authorizes it, but even read on its own that Tolentino agrees to pay losses resulting from her participation in the conspiracy. It is in no way a limitation on her liability for the returns prepared by her co-conspirators. This is one question the district court did have an opportunity to make some findings on, albeit in reference to the guideline calculation. This relevant conduct question was resolved in part on the record, and the court found that she was a full, knowing participant in this conspiracy, that the same fraudulent credits were claimed by all the co-conspirators, the same tax identifiers were used by all the co-conspirators, that she exercised discretion in her participation in the conspiracy, and that she was a fully knowing participant. I mean, we hold people liable for murder who had no gun, were just sitting in the getaway vehicle, but they knew the guy that was going in to do the robbery had a gun, and somebody ends up dead. We hold them liable for murder. Yes, Your Honor. So this is actually less big than that. But I would note that 3C does say, I'm sorry, 3E, that the defendant agrees may include restitution arising from all relevant conduct, not limited to that arising from the offenses of conviction alone. So all relevant conduct. So she does say that. And that's confirmed as part of that. But let me ask this. If we assume arguendo that there is confusion between 3 and 5, then how do we address that given that it wasn't raised in the district court? Under United States v. Landfear, mere a second— A non-presidential opinion? That's correct, Your Honor. But in that case, the court did explain that where you merely have a second alternative construction of the terms of that plea agreement, that cannot constitute plain error. Even if we give the plea agreement— Because normally ambiguities in the plea agreement are construed against the government, but you're saying when we're doing it under plain error, if there's an ambiguity, there's two reasonable constructions, you can take the reasonable construction in favor of the government and say that's not plain error to affirm that. Correct, because it doesn't demonstrate a clear or obvious error in the reading of that plea agreement. But even if we give it the construction that she advocates, even if we look at her conduct in preparing and filing— She only wants you to look at preparing. She only wants you to look at the tax returns she prepared, but it says preparing and filing. And her tax identifier was on every single tax return filed that is included in that restitution calculation. Tell me about that, because I could envision that somebody just starts signing my name stuff, signing off on opinions, and I have no knowledge of that, versus I give my signature stamp back in the day when we had that, which I would never do. I give my signature stamp to someone else and say go for it. Just sign off. Is that the distinction you're making between her just having no clue that people were using her number versus she knew they were using her number? She may not have overseen what they did with it, but having given out her number to all these other fraud-feasers, she's stuck with that. Well, and this is a step removed from just giving out her number. These co-conspirators were acting in concert, using that number together, claiming the same fraudulent returns, filing returns out of the same office. The government, if you look at page 158 of the record, did a calculation for just the breadth of this fraud, the number of returns that contained these false education credits. That comes out to 78% of every return they filed had fraudulent education credits attached to them for every single year of the conspiracy that we're looking at. This was not a one-off situation where she was off at a desk in the corner preparing returns and they were running wild with her tax number. She tried to make those arguments. She tried to say, I didn't know. I was just a low-level employee. That's what's in here. Right. That's what the district court evaluated and disagreed with, which we would give some deference because that is a fact-finding. Right. Did she know that people were using her number fraudulently, or did she think they were all honest, ethical people, and she was the only fraud user? Correct, and the district court made those findings, and it was well supported by the record. The record shows that not only was she a full participant in the conspiracy, but she acted to try to further it. There was a situation where the First Choice Tax Services figured out they were going to be audited, and Tolentino showed up to the office along with Oco and Gicana and helped to stuff 300-some taxpayer files with fraudulent 1098-T forms to try to substantiate the fraudulent education credits that had been claimed. That's in the evidence that she attached to her objections to the district court. So she's a full participant. She's running the Grand Prairie office by herself for the last two years. Seventy-eight percent of the tax returns have false education credits attached to them. For the last tax year alone, she generated over $600,000 in loss to the IRS. Did the other 22% just refuse to be involved in the fraud? I mean, were they the honest taxpayers? I mean, I'm just kind of wondering. Well, the record shows that sometimes these taxpayers didn't even know what was being done with their returns. They were handing their documents over, there were numbers being typed into the computer, and the return was being electronically filed, and they were just happy to get a bigger refund. So the district court's fact find in this regard is well supported by the record, and her burden is to show that it was implausible. You can't find that that relevant conduct determination was somehow implausible when the record fully supports her participation in a conspiracy of this breadth. And the plea agreement itself, the reading of the plea agreement authorizing recovery for all relevant conduct, was affirmed at rearrangement when she represented to the district court that she would be responsible for that. She signed for it in her factual resume, where it said that she would be responsible for restitution arising from all relevant conduct, and it's even in the PSR. The PSR affirmatively states that Tolentino agreed in her plea agreement to pay restitution for all relevant conduct. She didn't object to that provision of the PSR either. So you have the record itself showing consistently and across the board that Tolentino agreed to be responsible for the full amount of her relevant conduct. And, in fact, in her allocution to the district court, she said she asked for probation but said please hold me accountable for every penny. I want to pay back what I owe and made no objection whatsoever to the fact that she was being held accountable for the conduct of her co-conspirator. She's out of prison now, right? That's correct. So is she making any payments? I'm not aware of that. The order, I believe, called for restitution in the amount of 10% of her gross income or $50 a month. So, presumably, I don't have any evidence of a supervised release violation, so that would indicate that she would be making payments currently. Do you have anything else for us? Unless there are any further questions, we would just simply—yes, sir. I want to make one point. A 28J letter was filed with our court on the 7th of March in which the government cited to United States v. Bolton, discussed Bolton and then re-argued its case to us. That is not the purpose of a 28J letter, and our court is bouncing more of these, not even allowing them to be filed. So you might take that into consideration and look at Rule 28J and talk about it with the folks in your office, but 28Js aren't meant to be another bite at the apple of arguing your case. They're just supposed to point out new, not old, authority to us. Bolton, Your Honor, was issued in November of 2018. I'm not saying it's not new. I'm saying that's the point. We want to know new authority. We don't want you to re-argue your case to us. So simply point out the case— Well, just read the rule. Yes, Your Honor. We do—unless there are any further questions, the government— I think it is helpful to cite the new case and say this is relevant to Issue No. 2 or to Page 3 or something like that because I know why you make the argument is to get us oriented to why you're citing this case. But the problem comes when the lawyerly tendency to move on and keep going, and that's the part that concerns our court in terms of it becomes then a supplemental brief which you need leave to file. Yes, Your Honor. I will definitely take that back to my office. Thank you. Unless the court has any further questions, we would ask the court to affirm the restitution order in all respects. All right, counsel. Thank you. Thank you, Your Honors, for the opportunity to reply. Your Honors, regardless of— You had an opportunity to file a reply brief. I'm sorry? You also had an opportunity to file a reply brief. Yes, Your Honor. I want to talk about that with your office as well. Point taken, Your Honor. Thank you. What we have here is a clear legal error, a plain legal error, that there was a finding of an actual loss calculation attributed to Ms. Tolentino's actions of $37,000 found by the PSR as a factual finding that was accepted by the courts. The loss amount applied was an intended loss figure of $2.3 million. That $2.3 million included many things that were beyond the scope of what Ms. Tolentino actually did. The paragraph 19 itself on page 116 of the record describes the challenge of determining what was done by Ms. Tolentino's hand and what was not. So the PSR described it as virtually impossible to distinguish what was going on. What is your response? So the $37,000, are those just the returns that has her signature on them? That number does arise from that. Right, but what about the government's argument that her number, whatever the technical term is, was used on all of the returns? So the way that the evidence shows is that she was an employee working at the Grand Prairie office. The Grand Prairie office was one of two offices at times that First Choice had, one in Fort Worth, Texas and one in Grand Prairie, separated by 30 miles, give or take. Those two offices each had, eventually both had an EFIN number. The EFIN number is what is used to electronically file tax returns from the office, send it to the IRS. The PTIN number is ascribed to every person, it's supposed to be ascribed to every person who's paid to prepare a tax return. There are multiple people within First Choice who had PTIN numbers. She was one of them, but other people did as well. In fact, both of the co-owners and the other co-defendant that was in the case, all four people had PTIN numbers. But for the years 2009, 2010, and up until Fort Worth started filing things from its location in 2011, every tax return that was filed by this entire company was filed using her PTIN number. But what evidence do we have? Could the district court have inferred that she knew that? I'm sorry? Could the district court have inferred that she knew that? It's possible that it could have, but the court never addressed that. Was a point ever made before or at sentencing? Your Honor, again, going back to we believe it was. What do you mean you believe it was? From our reply to the government's objections and the changes to the restitution. And what did you say about the PTIN number? I would have to check the record on that, Your Honor. But we pointed out the challenges of distinguishing between the relevant conduct discussion where it points out that OCO applied for and received, had custody of her PTIN number, that she was not the one who was doing the electronic filings from the company. OCO himself said that Gichana She knew people had her number. I mean, if I had a number with the IRS, I'd be protecting that with my life. And so she knew they had her number, and she's not at all looking into who's using my number, how, you know, whatever, whatever. Your Honor, as an employee of the judiciary, the judiciary has all sorts of numbers for myself to identify myself with. My employer does. The same thing in this case. Her employer had those numbers because the employer is the one who filled out the application to help her obtain the PTIN number. So it's very reasonable to expect that she would So anything in her response that I did not know my PTIN number was being used for all of these filings? Actually, yes. In her own, in the memorandum discussing her, memorandum recording her discussion with the investigators, there's a reference to one incident where she learned that one time her PTIN had been used by not the co-owner but the other filer from the other office, and said that she became very angry in learning of that. But is that in her objections to the PSR or in any comments made at sentencing? It was not, Your Honor. All right. With that, my time is up. Unless there are other questions the court may have, I appreciate the opportunity to appear here today, and we respectfully request the court would vacate the sentence and remand for resentencing as to the issue of restitution alone. Thank you. Thank you, counsel. Thank you both for bringing this case to us.